NUMBER 13-03-674-CR

 

                         COURT OF APPEALS

 

               THIRTEENTH DISTRICT OF TEXAS

 

                  CORPUS CHRISTI - EDINBURG

 

 

 

JOSE VASQUEZ GONZALES,                                     Appellant,

 

                                           v.

 

THE
STATE OF TEXAS,                                              Appellee.

 

 

 

                  On appeal from the 377th
District Court

                           of Victoria
County, Texas.

 

 

 

                     MEMORANDUM OPINION[1]

 

                Before Justices Rodriguez, Castillo,
and Garza

                  Memorandum Opinion by Justice Castillo

 








A jury convicted appellant, Jose Vasquez Gonzales,
of murder.[2]  The jury assessed punishment at life
imprisonment in the Institutional Division of the Texas Department of Criminal
Justice.  By four issues, Gonzales
appeals his conviction by  (1)
challenging the factual sufficiency of the evidence, (2) asserting that the
trial court erred in allowing the testimony of an expert over the objection of
trial counsel, (3) claiming the trial court erroneously included language in
the jury charge which was not supported by the evidence, and (4) alleging his
trial counsel failed to object to improper jury argument rendering his
representation ineffective.  We affirm.

I.  BACKGROUND








Four members of a teenage gang gathered at a motel
room on the evening of June 17, 2001, and stayed there overnight.  On June 18, 2001, at around 6:00 a.m.,
someone knocked on the door.  The victim,
seventeen-year-old Martin Gonzales,[3]
arose to open the door.  Gunfire
erupted.  Martin=s friend, Jose Montoya, saw appellant Gonzales, a
member of a prison gang, at the door. 
Montoya identified Gonzales as the person who walked in and shot
Martin.  A second unidentified shooter
also shot into the room.  The second
shooter never entered the room.  Montoya
only saw a gun in a hand.  Pete Rendon,
who was asleep on the floor of the motel room, was also injured.  Martin died as the result of a gunshot wound
to his chest.  Montoya and a fourth
occupant were not injured.  Gonzales and
Martin were members of rival gangs.

II.  FACTUAL
SUFFICIENCY

In his first issue, Gonzales argues that the evidence
is factually insufficient  to support the
conviction.  The State responds that the
jury heard the evidence and made its decision based on factually sufficient
evidence. 

A.  Standard
of Review








A factual‑sufficiency review begins with the
presumption that the evidence supporting the jury's verdict is legally
sufficient, that is, sufficient under Jackson v. Virginia, 443 U.S. 307,
319 (1979).  See Clewis v. State,
922 S.W.2d 126, 134 (Tex. Crim. App. 1996) (en banc).  In a factual sufficiency review, the
appellate court views all the evidence in a neutral light and determines
whether evidence supporting the verdict is too weak to support the finding of
guilt beyond a reasonable doubt or if evidence contrary to the verdict is
strong enough that the beyond‑a‑reasonable‑doubt  standard could not have been met.  Threadgill v. State, 146 S.W.3d 654,
664 (Tex. Crim. App. 2004) (en banc).  A
clearly wrong and unjust verdict occurs where the jury's finding is
"manifestly unjust," "shocks the conscience," or
"clearly demonstrates bias."  Prible
v. State, No. AP‑74,487, 2005 Tex. Crim. App. LEXIS 110, at *16‑*17
(Tex. Crim. App. January 26, 2005) (designated for publication).  In conducting a factual sufficiency review,
we review all the evidence.  Cain v.
State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997).  We must consider the most important evidence
that the appellant claims undermines the jury's verdict.  Sims v. State, 99 S.W.3d 600, 603
(Tex. Crim. App. 2003).  However, we
approach a factual‑sufficiency review with appropriate deference to avoid
substituting our judgment for that of the fact finder.[4]  Johnson v. State, 23 S.W.3d 1, 6‑7
(Tex. Crim. App. 2000) (en banc).  Every
fact need not point directly and independently to the accused's guilt.  Vanderbilt v. State, 629 S.W.2d 709,
716 (Tex. Crim. App. 1981).  A conclusion
of guilt can rest on the combined and cumulative force of all the incriminating
circumstances.  Id.








Our neutral review of all the evidence, both for and
against the challenged elements, looks to determine whether proof of guilt is
so obviously weak as to undermine confidence in the jury's determination, or
whether proof of guilt, although adequate if taken alone, is greatly outweighed
by contrary proof.  See Zuniga
v. State, 144 S.W.3d 477, 484‑85 (Tex. Crim. App. 2004); see also
Zuliani v. State, 97 S.W.3d 589, 593‑94 (Tex. Crim. App.
2003).  We remain mindful of the jury's
role to resolve conflicts in testimony.  See Mosley v. State, 983 S.W.2d 249, 254
(Tex. Crim. App. 1998) (en banc) (holding that questions concerning the
credibility of witnesses and the weight to be given their testimony are to be
resolved by the trier of fact); see also Esquivel v. State, 506 S.W.2d
613, 615 (Tex. Crim. App. 1974).  We  must assume that the fact finder resolved
conflicts, including conflicting inferences, in favor of the verdict, and must
defer to that resolution.  Matchett
v. State, 941 S.W.2d 922, 936 (Tex. Crim. App. 1996) (en banc).

B.  Hypothetically Correct Jury Charge

We measure the factual
sufficiency of the evidence against a hypothetically correct jury charge.[5]  Adi v. State, 94 S.W.3d 124, 131 (Tex.
App.BCorpus Christi 2002,
pet. ref'd).  A hypothetically correct
charge is one that accurately sets out the law, is authorized by the
indictment, does not unnecessarily increase the State's burden of proof or
restrict its theories of liability, and adequately describes the particular
offense proof.  Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997); Cano v. State, 3 S.W.3d 99,
105 (Tex. App.BCorpus Christi 1999,
pet. ref'd).  A hypothetically correct
jury charge would not simply quote from the controlling statute.  Gollihar v. State, 46 S.W.3d 243, 254
(Tex. Crim. App. 2001).  Its scope is
limited by the statutory elements of the offense as modified by the charging
instrument.  See Fuller v. State,
73 S.W.3d 250, 254 (Tex. Crim. App. 2002) (Keller, P.J., concurring) (quoting Curry
v. State, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000)). 








Murder is a
"result of conduct" offense.  Cook
v. State, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993) (en banc).  We must decide whether a rational trier of
fact could have found beyond a reasonable doubt that Gonzales intentionally or
knowingly caused Martin=s death.  Tex.
Pen. Code Ann. ' 19.02(b)(1) (Vernon
2003).  A person acts intentionally with
respect to the result of his conduct when it is his conscious objective or
desire to cause the result.  Tex. Pen. Code Ann. ' 6.03(a) (Vernon
2003).  A person acts knowingly with
respect to the result of his conduct when he is aware his conduct is reasonably
certain to cause the result.  Id.
at ' 6.03(b).  

C.  Discussion

Gonzales argues that
the evidence is circumstantial and that the contrary evidence,  particularly evidence of identity, motive,
and tracing the ammunition to him, is strong enough that the beyond‑a‑reasonable‑doubt
standard could not have been met. The State counters that the evidence is
abundantly sufficient to support the verdict on various theories presented to
the jury. 

1.  Identity








Where identity is an
issue in the case, the identity of the perpetrator may be proved by direct or
circumstantial evidence.  Earls v.
State, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) (en banc) ("Evidence
as to the identity of the perpetrator of an offense can be proved by direct or
circumstantial evidence."). In our sufficiency review, we are governed by
the fact that the jury is the exclusive judge of the facts proved, the
credibility of the witnesses, and the weight to be given to the testimony.  Id.;
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979).  The jury may believe or disbelieve all or any
part of a witness's testimony, even though the witness's testimony has been
contradicted.  Id. (citing Sharp
v. State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986)).  Reconciliation of conflicts in the evidence
is within the exclusive providence of the jury. 
Id.  (citing Jones v.
State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996)).  Evidence is not rendered insufficient when
conflicting evidence is introduced.  Matchett,
941 S.W.2d at 936.  The reviewing court
must assume that the fact finder resolved the conflicts, including conflicting inferences,
in favor of the verdict, and must defer to that resolution.  Id.        

Montoya testified that
the shooter forced the motel room door open with his foot when Martin attempted
to close it.  Montoya stated he saw the
face of the shooter.  The sunrise afforded
some light both outside and inside the motel room.  He had never before seen the assailant.  After the assault, Montoya immediately
thought that the rival gang was involved because of recent fighting between
them.  When shown a photo lineup the day
of the shooting, Montoya did not identify the shooter, because he was
nervous.  He testified that Gonzales
"was the gang leader . . . He would probably kill me."  Upon initial questioning, he told the police
he saw nothing.  On the same day, Montoya
gave a videotaped statement[6]
to police and described the shooter as short with a dark complexion and long
hair.  He only saw the hand and gun of a
second shooter.  Hidden behind the door,
the second assailant did not enter the room.








 Eight days later, Montoya identified Gonzales
from a police photo lineup.  On
cross-examination, the following ensued:

Q.  Then a police officer shows you a lineup and
one of them is a [rival gang member] and he said, APick out the one that
did it?@

 

A.  Yes.

 

Q.  And so, you pick out the one that=s the [rival gang
member], is that right?

 

A.  Yes.

 

Montoya further
testified that he did not know any of the men in the photo identification
spread or whether, other than Gonzales, they were rival gang members.  He selected Gonzales solely because he was
the person he saw shoot Martin.  The
photo spread, admitted in evidence, shows Gonzales with short hair.  Montoya identified Gonzales at trial as the
shooter and testified Gonzales has a light complexion.           

Antonio Gudino
testified that he was in the motel room and that the lights in the room were
off.  He saw Martin open the door in
response to a knock and "they started shooting."  About eight or nine shots were fired.  Martin was killed and Pete Rendon, also in
the room, was injured.  When the shooting
started, Gudino was half asleep and did not see the shooters.  








Gonzales's friend,
Onesimo Salazar, testified that Gonzales was in his bar on June 17, 2001 from
8:00 p.m. to 2:00 a.m. the following morning. 
Gonzales's girlfriend, Shirley Robles, testified Gonzales arrived at his
home between 2:30 a.m. and 3:00 a.m. on June 18, 2001, and remained there until
8:00 a.m. or 9:00 a.m.  She further
testified she did not know whether or not Gonzales was in a gang.  Robles stated Gonzales had always had a light
complexion and short hair.  

We are not required to
conclude that the verdict was factually insupportable because the evidence of
guilt was not free of contradiction and the credibility of witnesses may have
been subject to question.  See Zuliani,
97 S.W.3d at 593‑94.  Those
circumstances merely create issues for the jury to resolve.  Id. 
We will not reverse unless (1) the evidence of Gonzales's guilt, taken
alone, is too weak to support the finding of guilt beyond a reasonable doubt,
or (2) the contrary evidence is so strong that the standard of proof beyond a
reasonable doubt could not have been met. 
See Zuniga, 144 S.W.3d at 484‑85.  Viewing the relevant evidence in a neutral
light, favoring neither the prosecution nor the defense, and with appropriate
deference to the jury's credibility determinations, we conclude the evidence
supporting Gonzales as the shooter is not too weak to sustain the jury's
finding of guilt beyond a reasonable doubt. 
Zuniga, 144 S.W.3d at 484‑85; Earls, 707 S.W.2d at
85.  Nor is the weight of the evidence
contrary to the verdict strong enough that the State could not have met its
burden of proof at trial.  Zuniga,
144 S.W.3d at 484‑85.  Thus, the
evidence is factually sufficient to prove identity.  

2.  Intent

Motive is a
significant circumstance indicating guilt.  Guevara v. State, 152 S.W.3d 45, 50 (Tex.
Crim. App. 2004).  Intent may also be
inferred from circumstantial evidence such as acts, words, and the conduct of
the appellant.  Id.  








If a deadly weapon is
used in a deadly manner, the inference is almost conclusive that the defendant
intended to kill.  Adanandus v. State,
866 S.W.2d 210, 215 (Tex. Crim. App.1993); see Bell v. State, 501 S.W.2d
137, 138 (Tex. Crim. App. 1973); Guerrero v. State, 655 S.W.2d 291, 292
(Tex. App.BCorpus Christi 1983,
no writ).  In fact, where a deadly weapon
is fired at close range and death results, the law presumes an intent to
kill.  Womble v. State, 618 S.W.2d
59, 64 (Tex. Crim. App. 1981). 

We have already
concluded that eyewitness testimony sufficiently  established Gonzales was the shooter.  The deputy medical examiner, Dr. Elizabeth
Peacock, testified that the cause of Martin=s death was a "through and through"
gunshot wound to the chest.  The gun was
at least three feet from Martin when fired but "it could be closer"
under certain circumstances.  Photographs
admitted in evidence depict Martin's body on the floor at the entrance to the
room next to the open door.  








Gonzales challenges
two prosecution theories to support motive involving evidence that (1) Gonzales
was going to fix a problem involving his girlfriend=s daughter, Jasmine,
and Martin; and (2) a fight between the two rival gangs in which the teenage
gang bested Gonzales=s gang.  Gonzales argues that other evidence tends to
disprove motive.  Gonzales directs our
attention to the testimony of Ricardo Moran DeJesus, who was living with
Gonzales's sister in June 2001.  DeJesus
testified that he overheard a conversation between Gonzales and his mother
about a teenager, Jasmine.  Jasmine had
appeared at the house crying and told Gonzales that someone made her cry.[7]  DeJesus overheard Gonzales tell his mother
that he was going to a motel to solve a problem.  Gonzales was mad when he left his mother=s house.  About a week later, DeJesus overheard
Gonzales tell his mother "an accident had happened" at a motel and
two people died.  Gonzales also told his
mother he was going out of town.[8]  

Gonzales argues that
contrary evidence negates motive.  He
points to testimony from Robles, Jasmine's mother.  Robles testified that Jasmine had never
visited Gonzales's mother=s house, stating,
"To this day, my daughter doesn=t even talk to
her."   








Gonzales also directs
our attention to the testimony of Johnny Ray Fuentes, a member of Gonzales's
gang, who has since renounced his affiliation. 
Fuentes testified that Gonzales was the highest ranking member of the
prison gang.  Fuentes stated that he knew
what happened at the motel.  He explained
that the teenage gang had recently won three out of four fights with Gonzales's
gang.  Fuentes decided to leave the gang
around December 2002 because Gonzales asked him to take the blame for the
murder, and he refused.  Since then,
there had been three attempts on his life. 
During one of the attempts, he recognized a member of Gonzales's
gang.  When the prosecutor asked,
"Now, who did the killing at the [motel]?," Fuentes answered,
"From what I know, it was two other people."  When asked, "It wasn't [Gonzales] was
it?," he answered, "From what I know."  He was asked again, "From what you know,
it wasn't him?"  Fuentes answered,
"No, sir."  When asked,
"From what you know, he wanted you to take the rap for something he didn't
do?," he testified, "Yes." 

Gonzales argues that
the evidence is too weak to support motive. 
He essentially argues that Fuentes' testimony was self serving and not
credible because Fuentes had a motive to attack Gonzales's gang.  








However, the jury also
heard that Jasmine was at the scene of the shooting between 6:00 a.m. and 7:00
a.m.  Carmen Villarreal was registered at
the motel.  She saw a girl named Jasmine
in a car full of girls.  Jasmine asked
her what happened and Villarreal told her Martin was killed.  One of the girls in the car laughed and they
left.  The jury may infer the requisite
intent from any facts which tend to prove its existence, including the acts,
words, and conduct of the accused, the method of committing the crime, and the
nature of the wounds inflicted on the victims. 
Hart v. State, 89 S.W.3d 61, 63 (Tex. Crim. App. 2002).  By its verdict, the jury rejected the
evidence of an alibi and evidence Gonzales argues negated motive.  The medical examiner=s testimony placed
Martin at least three feet away from Gonzales when he was shot.  The jury could have reasonably inferred the
intent to kill (1) from the proximity of the victim from the shooter, (2) from
testimony that Gonzales said he was going to fix a problem at a motel involving
Martin and Jasmine,  or (3) from
testimony that he wanted Fuentes to take the blame for the murder.  With proper deference to the jury's role, we
conclude that the evidence supporting motive is not too weak to sustain the
jury's finding of guilt beyond a reasonable doubt.   Zuniga, 144 S.W.3d at 484‑85; Earls,
707 S.W.2d at 85.  Nor is the weight of
the evidence contrary to the verdict strong enough that the State could not
have met its burden of proof at trial.  Zuniga,
144 S.W.3d at 484‑85.  Thus, we
conclude the evidence was factually sufficient to prove motive.

We overrule the first
issue presented.

III.  ADMISSION OF EXPERT TESTIMONY








In his second issue,
Gonzales requests this Court to review the trial court's ruling on the
admissibility of expert testimony regarding bullet lead analysis under the
scientific evidence test set out in Daubert and Kelly. See
Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-94 (1993); Kelly
v. State, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).  Gonzales argues that the trial court abused
its discretion by allowing the testimony of Charles Peters, an FBI expert on
comparative bullet lead analysis,[9]
because the evidence was not reliable.  The State counters that, at the Daubert hearing,
Peters testified as to each of the factors enumerated in Kelly and the
science is reliable.  

A.  Standard of Review

The question squarely
before the trial court was whether the expert testimony was sufficiently
reliable and whether its probative value outweighed the danger of its
prejudicial effect, if any, to warrant admission.  We review a trial court=s admission of expert
testimony under an abuse of discretion standard.  Penry v. State, 903 S.W.2d 715, 762
(Tex. Crim. App. 1995); see Holloway v. State, 613 S.W.2d 497, 501 (Tex.
Crim. App. 1981) (en banc).  Absent a
clear abuse of that discretion, the trial court's decision to admit or exclude
testimony will not be disturbed.  See
Penry, 903 S.W.2d at 762.  Under this
standard, a trial court's decision to admit certain scientific evidence must be
within the zone of reasonable disagreement in light of evidence offered at a Daubert
hearing and the requirements of the Texas Rules of Evidence.  See Montgomery v. State, 810 S.W.2d
372, 380 (Tex. Crim. App. 1991) (op. on reh=g); see also Tex. R. Evid. 702.                                   

B.  Burden of Proof








In determining the
admissibility of novel scientific evidence, the threshold question asked by
both rule 702 and Kelly is, "whether the testimony will help the
trier of fact understand the evidence or determine a fact in issue."  State v. Medrano, 127 S.W.3d 781, 784‑85
(Tex. Crim. App. 2004) (en banc); see Tex.
R. Evid. 702 (stating that evidence should be admitted, "if
scientific, technical, or other specialized knowledge will assist the trier of
fact to understand the evidence or to determine a fact in issue.").  In Kelly, the Court of Criminal
Appeals reasoned that "the trial court's first task is to determine
whether the testimony is sufficiently reliable and relevant to help the jury in
reaching accurate results," because "'unreliable . . . scientific evidence
simply will not assist the [jury] to understand the evidence or accurately
determine a fact in issue.'"  Medrano, 127 S.W.3d at 784‑85
(quoting Kelly, 824 S.W.2d at 572). 
Kelly states that "before novel scientific evidence may be
admitted under rule 702, the proponent must persuade the trial court, by clear
and convincing evidence, that the evidence is reliable and therefore
relevant."  Id.  The reliability of novel scientific evidence
is the cornerstone of the opinion in Kelly.  Id. 


Proving reliability
requires that the proponent establish that (1) the underlying scientific
technique is valid, (2) the technique applying the theory is valid, and (3) the
technique has been properly applied on the occasion in question.  See id.  Additionally, a trial court may consider seven
factors which could affect reliability.[10]  Id. 
This standard was expanded by the Court through Hartman v. State,
946 S.W.2d 60, 63 (Tex. Crim. App. 1997) (en banc), in which the Court held
that the standard established in Kelly applies to all scientific
evidence offered under rule 702.  Id.









C.  Discussion

At the Daubert/Kelly
hearing, Peters was the sole witness to testify.  He 
testified that, in his opinion, after testing five bullet fragments
recovered from the scene, the bullet fragments were likely produced at the same
time as bullets found in a box of ammunition seized from Gonzales's
residence.  The record shows that Peters
addressed, distinguished, and countered each contrary study presented during
rigorous cross-examination at the hearing. 
At the end of the hearing, the trial court overruled the motion in
limine to exclude his testimony, relying on State v. Noel, 157 N.J. 141,
148 & 152 (N.J. 1999) ("questions regarding whether bullets come from
the same box affect the weight of the evidence rather than its
admissibility" and "the testimony constituted a link in the chain of
evidence connecting defendant to the murder").     

Rule 702 governs the
admissibility of expert testimony and scientific evidence.  See Medrano, 127 S.W.3d at 786.  Reliability was and remains a central theme
of rule 702 because the rule requires that any expert be able to assist the
trier of fact to understand the evidence or to determine a fact in issue and
because unreliable scientific evidence simply will not assist the jury to
understand the evidence or accurately determine a fact in issue.  See id. 









Gonzales directs his
complaint to no specific Kelly factor; rather, his complaint is
generally that the "science is unreliable."[11]  The challenge to Peter's testimony at the
hearing was that his analysis "has some scientific validity but studies
have found there is really no reason to believe that the properties could be
compared with any certainty." 
Peters testified that he compared seven common elements in the samples
tested.  The prosecutor asked, "So,
this is more accurate and reliable than most of the bullet lead tests you
conduct?"  Peters responded,
"It is certainly the best that we could have."  

We conclude that the
trial court fully executed its gatekeeping function and did not abuse its
discretion by admitting the expert testimony.  See Hernandez v. State,  116 S.W.3d 26, 31 n.11 (Tex. Crim. App. 2003)
(en banc); Montgomery, 810 S.W.2d at 878.  The evidence made it more probable than not
that the expended bullets originated from the ammunition box found in
Gonzales's residence.  See Tex. R. Evid. 401 & 403.  Gonzales
was free to challenge the expert's conclusions and point out the weaknesses of
the analysis to the jury during cross‑examination.  Weight and credibility are the province of
the jury.  "Vigorous cross‑examination,
presentation of contrary evidence, and careful instruction on the burden of
proof are the traditional and appropriate means of attacking shaky but
admissible evidence."  Daubert,
509 U.S. at 596.[12]          

We overrule the second
issue presented.








IV. JURY CHARGE ERROR 

In his third issue,
Gonzales argues that, over objection at trial, the charge authorized the jury
to convict upon a theory not supported by the evidence.  The State responds that the alternate theory
was grounded on evidence adduced at trial. 


A.  Standard of Review

The function of the
jury charge is to instruct the jury on the law applicable to the case.  Escobar v. State, 28 S.W.3d 767, 778
(Tex. Crim. App. 2000); Dinkins v. State, 894 S.W.2d 330, 338 (Tex.
Crim. App. 1995).  When we review whether
there has been error in a jury charge, we apply an Almanza analysis to
determine (1) whether error actually exists in the charge, and (2) whether any
resulting harm requires reversal.  Escobar,
28 S.W.3d at 778; Mann v. State, 964 S.W.2d 639, 641 (Tex. Crim. App.
1998); Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

B.  Discussion








Gonzales argues that
the charge impermissibly allowed the jury to convict on the theory that he
ordered other unknown persons to shoot Martin without evidence to support the
instruction.[13]  The charge on culpability authorized the jury
to convict Gonzales if it found beyond a reasonable doubt that Gonzales (1)
murdered Martin by shooting him, (2) aided or attempted to aid an unknown
person to murder Martin by also shooting at Martin, or (3) directed an unknown
person to murder Martin by giving the order to commit the offense.  The charge also instructed the jury on the
law of parties.  








Thus, conviction was
authorized under the evidence in this case if a rational jury could find that
Gonzales intentionally caused Martin=s death, either as a
principal or as a party.  See Tex. Pen. Code Ann. ' 19.02(b)(1) (Vernon
2003); see also Hanson v. State, 55 S.W.3d 681, 690 (Tex. App.BAustin 2001, no
pet.).  A person commits murder if he
intentionally or knowingly causes the death of an individual.  Tex.
Pen. Code Ann. ' 19.02(b)(1) (Vernon
2003).  A person is criminally
responsible as a party to an offense if the offense is committed by his own
conduct, by the conduct of another for which he is criminally responsible, or
by both.  Id. ' 7.01 (Vernon 2003). A
person is criminally responsible for an offense committed by another if, with
intent to promote or assist the commission of the offense, he solicits,
encourages, directs, aids, or attempts to aid the other person to commit the
offense.  Id. ' 7.02(a)(2) (Vernon
2003).

Gonzales's sole
complaint focuses on the perceived fatal variance between the jury charge and
the evidence adduced at trial.[14]  Thus, on the charge presented, the  jury could convict him if it found that he
was "present at the commission of the offense and encourage[d] its
commission by words or other agreement." 
King v. State, 29 S.W.3d 556, 564 (Tex. Crim. App. 2000) (en
banc); see Ransom v. State, 920 S.W.2d 288, 302 (Tex. Crim. App.
1996) (en banc). 








Montoya testified that
a second unidentified assailant fired shots into the motel room.  Fuentes testified Gonzales asked him to take
the blame for the shooting.  DeJesus
testified that Gonzales said he was going to fix Jasmine's problem at a motel.
Jasmine appeared at the scene shortly after the shooting.  Detective Melissa Wasicek testified
extensively regarding Gonzales's confirmed affiliation with a prison gang.[15]  He held the rank of captain.  She testified about fights between the
teenage gang and the prison gang before the motel shooting.  The teenage gang won "some of the actual
fist fights" and "disrupted" the prison gang members by
"going by a bar or a place where they gather."  The teenage gang "shouted insults"
at the prison gang and there was a lot of "'disrespect.'"  Fuentes testified as to his membership in
Gonzales' prison gang.  He testified
that, because Gonzales was the captain, the highest local rank, he was the
decision maker in the city.  Gonzales
made the decision as to who was killed. 
At the time of the shooting, he retained the rank as the head of the
local prison gang.  The prison gang would
put the teenage gang in its place if it "disrespected" the prison
gang, by disrespecting a member of Gonzales's family, fighting, yelling, and
passing by "a bar where the highest ranking member is."   

The application
paragraph charged Gonzales as a principal or a party.  The jury was authorized to convict on either
theory.  We conclude that the evidence
adduced at trial supported the party theory and instruction.  We further conclude that the trial court made
Gonzales's culpability depend on a finding that he committed the offense acting
either alone or as a party.  Because the
jury was authorized to convict him if it found he was acting alone, any error
was harmless.  See Stein v. State,
514 S.W.2d 927, 934 (Tex. Crim. App.1974); Hannon v. State, 475 S.W.2d
800, 801 (Tex. Crim. App. 1972); see also Tex. R. App. P. 44.2. 

We overrule the third
issue presented.

V.  EFFECTIVE ASSISTANCE OF COUNSEL








In his fourth issue,
Gonzales argues that his trial counsel's failure to object to improper jury
argument rendered his representation ineffective.[16]  The State responds that the failure to object
was, arguably, based on strategy. 

A.  Standard of Review

A claim of ineffective
assistance of counsel must be firmly supported in the record.  McFarland v. State, 928 S.W.2d 482,
500 (Tex. Crim. App. 1996) (per curiam) (en banc).  When determining the validity of a
defendant's claim of ineffective assistance of counsel, we must be highly
deferential to trial counsel and avoid the distorting effects of
hindsight.  Ingham v. State, 679
S.W.2d 503, 509 (Tex. Crim. App. 1984) (en banc).  We presume counsel's performance was the
result of sound or reasonable trial strategy. 
Strickland v. Washington, 466 U.S. 668, 688 (1984); also
Stafford v. State, 813 S.W.2d 503, 506 (Tex. Crim. App. 1991) (en
banc).  We will not base a finding of
ineffectiveness on speculation.  See
Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (per curiam); Gamble
v. State, 916 S.W.2d 92, 93 (Tex. App.BHouston [1st Dist.]
1996, no pet.).   

B.  Discussion








Gonzales has not
rebutted the presumption he was adequately represented.  See Strickland, 466 U.S. at 688.  Regardless of counsel's failure to object to
a perceived improper jury argument, Gonzales has not proven to a reasonable
probability that, but for counsel's failure to object, the result of the
proceeding would have been different.  See
Strickland, 466 U.S. at 698; see also Ex parte White, 2004 Tex.
Crim. App. LEXIS 1612, at *22‑23 (Tex. Crim. App. Sept. 29, 2004).  When the record is silent regarding the
motivation of counsel's tactical decisions, the defendant cannot overcome the
strong presumption that counsel acted reasonably.  Mallett v. State, 65 S.W.3d 59, 63
(Tex. Crim. App. 2001).  In most cases,
the record on direct appeal is insufficient to review claims of ineffective
assistance of counsel.  See Thompson
v. State, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999); see also Ortiz v.
State, 93 S.W.3d 79, 88‑89 (Tex. Crim. App. 2002) (en banc) ("If
counsel's reasons for his conduct do not appear in the record and there is at
least the possibility that the conduct could have been legitimate trial
strategy, we will defer to counsel's decisions and deny relief on an ineffective
assistance claim on direct appeal."). 


Thus, on this record,
we conclude that Gonzales has failed to establish that his trial counsel was
ineffective.  Without a record of trial
counsel's overall performance and strategic decisions, we cannot determine if
counsel's performance was objectively deficient or if it created an
unnecessarily disadvantageous result.  See
Jackson, 877 S.W.2d at 771.  

We overrule the fourth
issue presented.

 








 VI. 
CONCLUSION

We affirm the trial
court judgment.

ERRLINDA CASTILLO

Justice

 

Do not publish.

Tex.
R. App. P. 47.2(b).

 

Memorandum Opinion delivered 

and filed this 23rd day of June, 2005.

 

 

 

 

 

 

 

 











[1] See Tex. R. App. P. 47.2 & 47.4.





[2] A person commits murder if he
intentionally or knowingly causes the death of an individual. Tex. Pen.
Code Ann. '19.02 (b)(1) (Vernon 2003).  The indictment alleged that, on or about June
18, 2001, Vasquez intentionally and knowingly caused the death of Martin
Gonzales by shooting him with a firearm. 
The indictment contained two enhancement counts.





[3] We refer to Martin Vasquez as
"Martin" for the sole reason that appellant has the same last
name.  





[4] We always remain aware of the fact
finder's role and unique position, a position we are un-

able to occupy.  Johnson
v. State, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000) (en banc).  Exercise of our authority to disagree with
the fact finder's determination is appropriate only when the record clearly
indicates our intervention is necessary to stop manifest injustice.  Id. at 9.  Otherwise, we accord due deference to the
fact finder's determinations, particularly those concerning the weight and
credibility of the evidence.  Id.  Absent exceptional circumstances, issues of
witness credibility are for the jury, and we may not substitute our view of the
credibility of a witness for the constitutionally guaranteed jury
determination.  Id. 

 





[5] The court of criminal appeals has
not specifically applied the hypothetically correct jury charge analytical
construct to factual‑sufficiency reviews in jury trials.  See Zubia v. State, 998 S.W.2d 226,
227 n.2 (Tex. Crim. App. 1999) (per curiam) (en banc) (dismissing as
improvidently granted the question of whether Malik should extend to
factual grounds not submitted to the jury). 






[6] The videotape is not in the
appellate record.





[7] 
Montoya testified earlier in the trial that Jasmine was upset by
Martin's recent end to their relationship. 
Martin left Jasmine to reunite with the mother of his child. 





[8] 
At the time of trial, DeJesus was no longer with Gonzales's sister.  When asked if he was worried about
testifying, he stated, AI don't want anything to happen to
me.@





[9] Peters described the scientific
basis for bullet lead analysis:

 

[W]e have a bullet and, generally,
firearms cannot match that bullet to the rifling of a barrel because maybe too
much damage has happened to the bullet or maybe a gun=s not recovered or various other
reasons.  The question is, can we
associate this bullet with the suspect through other terms?  And that=s what we call this comparative lead analysis and that's
what we are here about today.  The basis
is . . . that things made from the same solution will have the same
composition.  Different things made at
different times will have different compositions.   

 

Peters described how bullets are
made.  In his comparative lead analysis,
he looks for seven elements within the lead in the bullet.  





[10] 
These factors are (1) the extent to which the underlying scientific
theory and technique are accepted as valid by the relevant scientific
community, if such a community can be ascertained; (2) the qualifications of
the experts testifying; (3) the existence of literature supporting or rejecting
the underlying scientific theory and technique; (4) the potential rate of error
of the technique; (5) the availability of other experts to test and evaluate
the technique; (6) the clarity with which the underlying scientific technique
can be explained to the court; and (7) the experience and skill of the
person(s) who applied the technique on the occasion in question.  State v. Medrano, 127 S.W.3d 781, 785
(Tex. Crim. App. 2004).





[11] We broadly construe the complaint
as based on the first Kelly factor. 
See Tex. R. App. P.


38.1(e).  However, the State argues that the issue
appears to be based on the "general acceptance" theory abandoned in Kelly.  





[12] 
Even if the trial court abused its discretion, the admission of the
evidence was harmless because the testimony was a "link in the chain"
of overwhelming evidence connecting Gonzales to the murder.  See Tex.
R. App. P. 44.2; Noel, 157 N.J. at 146.  Expert testimony of bullet lead analysis has
been admitted in a jury trial in Texas.  See
Jacques v. State, No. 08‑02‑00491‑CR, 2004 Tex. App.
LEXIS 7264, at *8-*9 (Tex. App.BEl Paso 2004, no pet.) (not designated for publication).    





[13] The charge instructed, in relevant
part:

 

Now if you find from the evidence
beyond a reasonable doubt that on or about the 18th day of June, 2001, in
Victoria County, Texas, the defendant JOSE VASQUEZ GONZALES did intentionally
or knowingly cause the death of an individual, namely:  MARTIN GONZALES, by shooting the said MARTIN
GONZALES with a firearm; or 

 

if you find from the evidence
beyond a reasonable doubt that on or about the 18th day of June, 2001, . . . a
person unknown did intentionally or knowingly cause the death of an individual,
namely: MARTIN GONZALES, by shooting the said MARTIN GONZALES with a firearm,
and the defendant JOSE VASQUEZ GONZALES did then and there, with intent to
promote or assist the commission of said offense: aid or attempt to aid said
person unknown by also shooting at the said MARTIN GONZALES with a firearm; or
direct said person unknown to commit said offense by giving the order that the
offense occur, 

 

then you will find the defendant
guilty of the offense of MURDER as alleged in the indictment.  

 





[14] The indictment charged Gonzales as
a primary actor with regard to the murder and did not charge him as a party to
the offense.  The State did not need to
indict Gonzales as a party to murder in order for the jury to convict him as a
party to that offense.  Jackson v.
State, 898 S.W.2d 896, 898 (Tex. Crim. App. 1995), overruled on other
grounds, Malik v. State, 953 S.W.2d 234, 239 (Tex. Crim. App.
1997).  The law of parties may be applied
to a case even though no such allegation is contained in the indictment. Id.;
Pesina v. State, 949 S.W.2d 374, 377 (Tex. App.BSan Antonio 1997, no pet.). 





[15] Wasicek testified that Gonzales
was a documented, self-proclaimed gang member in the prison system.  Evidence seized from his residence included
photographs showing Gonzales displaying the gang sign and documents reflecting
the "gang's obligations and responsibilities."  





[16] Gonzales asserts that his trial
counsel did not object to following argument during the culp- ability phase of
the trial:

 

You think about it.  Inside that room, 332, is just a gang of kidsB16, 17-years old, too young to
legally drink, couldn't vote, barely old enough to drive, all high school
students.  When you think about that, who
says it couldn=t have been your kid?  I know you have kids, probably not members of
a gang.  Who says your kids wouldn't have
known them or kids like them and be around them at the same time.  You see, it doesn't matter where or how, but
have your kids ever disrespected an adult? 
And the [prison gang] has shown what happens when they disrespect an
adult.  It could have been your kid that
disrespected the [prison gang].  And it
could have been your kid on the emergency room bed.

 

The prosecutor, however, continued:
"Why?  Because here in our town, in
Victoria, is a . . . prison gang.  Their
purpose, to terrorize.  And, to be able
to terrorize, they have to have people fear them and they must do that to get
others to fear them and that's how they get respect, by being feared."